All rise. The Illinois Appellate Court's Second Division is now in session. I'll offer Justice Daniel J. Fields the floor. Good morning. Madam Clerk, would you call the first case, please? Good morning. Will the attorneys who are going to argue please identify themselves and indicate to the court how much time they'd like for their arguments? Thank you, Your Honor. James Suris for the Plaintiff Appellate's case for Oleh. We would like no more than 20 minutes for arguments and say no more than 10 minutes for our rebuttal. Okay. In addition, Jackson Lewis for the Defendant Appellee's case for Kirk. We would request 20 minutes for our argument. So that's what, an hour? Much more time than we normally give, but let's see how you do.  Thank you, Your Honor. All right, Mr. Suris. May it please the Court. As I indicated, my name is James Suris. I represent the Plaintiff Appellant, Kathy Oleh, who sought to represent a class of employees who the Defendant Appellee, Neiman Marcus, subjected to credit checks at the time of hire. We are here following the trial court's grant of summary judgment in favor of Neiman Marcus based on the trial court's interpretation of the word access. But no class, there's been no class search? No, such proceedings took place. We did not get that far. That's correct, Your Honor. We're here based on the interpretation of a word, specifically the word access, as used in a fairly recently enacted act, the Illinois Employee Credit Privacy Act. We'll just call it the act because that's a bit of a mouthful. This is an important case. We believe it's a case of first impression. We thought so at the trial court level as well. We believe the trial court ruled incorrectly as to its interpretation as a matter of law at what the word access means, and therefore we request this Court reverse that order which granted summary judgment and remand for further proceedings, including trial proceedings. The basic facts are these. In June of 2012, Kathy Oleh Why don't you really get right into it and tell us your argument. Thank you. Thank you, Your Honor. I will absolutely do that. Well, the case concerns how we interpret this word access, and was it proper for the trial court to use what we believe was a very literal definition to rule on summary judgment based on that literal definition, based on the facts of our case? Essentially what it boils down to, and I know you're familiar with the facts, is that a sales associate position involves a lot of things. It involves basically what a typical retail sales associate, you would expect them to do, to use a POS system. They process credit card transactions and so forth. It's important to understand they are restricted from accessing personal data. The thrust of the case, Your Honors, is that they essentially use, and this is in the record, they take a credit card application as part of their job duties from a potential customer and they put it in a secure slot at the POS system. Is it true that anybody who's on the floor for Neiman Marcus could take one of those applications? Yes, Your Honor. So if that's true and take their argument to its logical conclusion, as you mentioned in your brief, that means everybody has to go through a credit check. Well, and that's sort of our point, Your Honor, and it's more than that. It's not just everybody at Neiman Marcus. It is broader than that. It would extend to any employee at any, not just a retail store, but honestly we were grasping with trying to find jobs where this would not apply to because, you know, so many jobs involve credit card transactions. We actually have a live credit card. So many jobs involve having a driver's license. You're checking for an ID, and a driver's license arguably has more personal information. For example, a vendor at Wrigley Field would need to check somebody's ID to see if they're 21. So would a restaurant bartender or a bouncer. You know, cab drivers have to see credit cards and so forth. And honestly, we're trying to figure out which employees could at least arguably lose the protection of this act, which of course was designed to protect these folks, not only to preserve their privacy, but presumably to help the economy. The legislative history does indicate employees who would not fall within the exception. A forklift driver, for example. Right. Okay. So we're really focusing on more than a laborer's position, a mechanic, a construction worker, things like that. Right? We're dealing primarily in the retail industry. I think that's... With the exclusion specifically in the financial industry, banking, et cetera. Right. The legislature did focus on taking them out of securities, state government, law enforcement, et cetera. So the thrust of this case really does seem to be how far does this go in the, let's call it the retail industry. Right? You hit it exactly on that. Okay. So why do you focus on that? Well, our position is this. The word access is subject arguably to a lot of meanings, not just one. The trial court used one meaning, and that was the literal meaning. We don't concede that that was reasonable. But even if it was, there are a lot of other reasonable definitions of the word access. For example, and we were left to try to consult Black's Law Dictionary, having nowhere else to turn. It's a case of first impression. The act itself does not define that word, unfortunately. But one definition has to do with having access to restricted records. Now, the employees here admittedly don't have access to restricted records. They are absolutely prohibited from accessing the database with customer information. So wouldn't we go to the statutory definition of personal and confidential information to see what access we're talking about, access to what type of information? Absolutely, yes. And the application does concededly by us have a slot where the customer is going to put their social security number. I don't know it has a whole lot else. I think it has their name and maybe a date of birth and so forth. So a social security number, we understand it's sensitive information. It's confidential and so forth. But what we are saying is that the nature of the access to that information is such it is so limited. It is so unsusceptible, not susceptible to misuse by the employee because, you know, they're in this store. They are subject to constant real-time monitoring by security. There's like four guys in a room watching everything the employees do. But wouldn't the statute further take you down the road that you want to go in when the statute defines personal and confidential information to say that once it's given to the employer, the company, the store, that they only entrust that information to a select few, to a manager and not to a low-level employee? Isn't that a further refinement of the type of information that we're talking about? I think that's absolutely correct. And in this case, I think the record shows that they have chosen to limit the information to about 2% of the employees. And we got that by I believe the numbers were 300 out of the 15,000 employees or so in general. So it isn't that Neiman Marcus allows the overwhelming majority of its employees to have access to this information. Access meaning retention, authority. I apologize. Not just retention, but being able to get into the secure database once it's in there. The computer system, in other words. And that's understandable in this day and age of identity theft where people don't misuse one-off security numbers at a time. It's a massive data breach. Tens of thousands of credit card numbers, social security numbers are being misused for a breach at any given time. I think Neiman Marcus is actually a victim of that at one point. But be that as it may. So isn't this about the exemptions? It is, Your Honor. Absolutely. And the trial court focused on the one that we are here obviously discussing today, and that is access. Access to personal, confidential, sensitive information. The exemption, exception, lists a number of areas where that would apply. You know, national security, we get that. Look, if somebody has access to a patent, a secret formula, we get it. The banking industry, we get it. But these are low-level, hourly paid employees just starting off in entry-level positions just trying to make their way. Well, are your documents still in your seal? That's a very good question, Your Honor. I don't know for certain. I would be happy to get back to Your Honor with that information to give you an absolute statement. I don't want to misspeak. I don't know for certain, Your Honor. And I apologize for not knowing for certain. You know, getting back to why we're here, another definition, it's not just the, you know, being able to access restricted records. Another definition is the opportunity to use or benefit, you know, from this information, from this whatever is on their application. As I understand what you said, the only information that you considered confidential or personal would be the social security number on the application. Is there anything else that you would say would come in within that? It's the record of C-58, Your Honor, that has a sample of the application. I'm just trying to find out what you would consider sensitive information. Anything besides that. You know, on here is things like your e-mail address, your name. I don't know if you being a homeowner is necessary. It asks, are you a homeowner, yes or no. I don't know if that's. Your interpretation of sensitive information, is it anything other than the social security number? No, I think it could encompass other things. It's just not on this application. No, I'm talking about this application. Okay. We're only talking about this application. Sure. I suppose, you know, the statement regarding your annual income is personal information. The reason I focused on a social security number is that we all understand that's subject to misuse. There's other information that's requested that could come within personal confidential. There's really, I mean, this is what it is. And I'll just, for the record, I mean, it's asking for your phone number. It's asking for your social security number, your annual income, whether you're a homeowner or not, and your e-mail address, and then it asks you to sign. And actually, you're not even printing your name, so it might be hard to read a signature. But that's the gist of it, you know. To me, the real issue is the social security number. I get that. I understand. But if you go back to opportunity to misuse something, I just, it's very difficult for us to understand how this retail sales employee taking this, which is what they have in their hands, I get it. And, you know, we asked their witnesses how they might do it, and it was, well, you know, they could write down the number on a piece of paper. They could take a picture of it using their cell phone, their iPhone. Conceivably, that could happen. Then they would go home somehow and misuse it. But, boy, I mean, we're public. We're a formal customer. But still, I mean, the idea is, isn't there a difference between a credit card itself and an application for a credit card? Because on the credit card itself, on the driver's license, your social security, at least in Illinois, your social security number is not there. So we are talking about something that's different. And so if we wanted to make a rule and try to understand what this legislator is trying to do, when they talk just generally about access to, we're talking social security numbers on applications, that could be something that could be specifically sensitive that you would want to protect. It's possible. We just don't know because the legislature didn't tell us. And that's why we reverted that to, well, you know, shouldn't a trier of facts maybe tell us whether or not, under the facts of our specific case, is this access in terms of access to the degree where you can discriminate on the basis of your credit score in any point in context? It goes back to what the word access means. And maybe that's ambiguous. And maybe we should be trying to define what access means in this situation so that courts that have other cases like this can understand what that is. You're absolutely right. And here is what we were struggling with. You know, we have legislative history that we thought we had to fall back on given the no definition. And we have Senator Harmon, who is the main speaker on this, who tells us, look, it's not really meant for somebody using a POS system. And they didn't talk about applications specifically, admittedly. But they did talk about things like credit card transactions. And that's where you have a live card in your hand, which is subject to at least as much abuse as a social security number in your hand, if not more so. I mean, the person actually has it. And then, again, taken to its extreme, if we have employees that look at things like a driver's license on a person, yes, it doesn't have a social number, but it does have your name, your date of birth, your driver's license number, your home address. It has your weight, your height, and it could even have your blood type. So there's a lot of personal information on that as well. And, boy, there's a whole lot of jobs out there that you could discriminate, you know, given this ruling in an employment context based on all that being arguably access to personal, confidential, sensitive information. It just seems that the exception here is swallowing the rule. So what would you suggest that the court make the definition? Well, how would you characterize it? We really weren't asking the court to. Let's say we have to. I know. But if we're going to reverse. Okay. You want us to reverse. We want to reverse and allow the trier of fact to decide is this access in the context of our case. We weren't really asking for anything more than that. How would you expect a finder of fact, a jury, for example, to wind their way through every scenario we discussed briefly and say, well, is that access, is that not access, or really is that access? You know, jurors would be sitting there saying, well, he handed in the application, that's access. But is that really what the legislature was focusing on? My reading of the legislative history is that Senator Harmon repeatedly said we want to stop discrimination by employers against applicants where their credit history isn't relevant to the job they're applying for. It's not relevant to a forklift operator, whether he's got a good credit history. Well, maybe it is relevant if the forklift operator is taking a detour and putting the stuff on the forklift into the back of his van, right? It is relevant. I mean, but maybe it's not. Excellent point. If we were to say we should have some type of a rule, I guess our suggestion would be, look, does the job involve access to restricted records in the sense that this is something already in the employer's hands? The employer has taken possession of it. It's in some type of a computer database. It's there. So there are people, of course, at Neiman Marcus who need to access that information, security people, people that actually process, you know, the credit transactions and so forth. We get how those people should, you know, have credit checks. We understand that. But somebody who just serves as a conduit, you know, it seems extremely broad to us. And the alternative to that, we were saying that, again, we wouldn't ask the jury to decide globally what this means simply based on the facts of our case. You know, was it proper to deny this person a job, which she was, based on her credit history, because it's a fact or not that she had access? And a jury would tell us whether or not they agreed with that. So under your definition, you use the word conduit. So if you're simply a conduit of information, that does not meet the standard of access under the Act. That would be one way to define what access means, because conduit means you're just in a stream of things. You're taking the information and you're putting it someplace else, which is exactly what they're doing here. And then once it's in the computer system, they can't get that information. So if that was the rule across the board, it would apply to other situations where people are simply conduits, simply receive it and move it to someplace else momentarily. It's not something that they keep and retain. And anticipating what counsel may suggest, just to clarify that, we are, we would focus, in all fairness, on the amount of time involved and the distance, because I can easily see somebody saying, well, you're a conduit. If you're taking information and you have the opportunity to take it home with you because it's being delivered miles away, well, we get how somebody could possibly abuse it. So I guess I would just take pains to say that we understand that maybe that is also too extreme the other way. And that's why we're so focused on the facts of our case, because they really are a conduit for moments, for a few feet at best. And that's assuming in this day and age of the Internet that there's a lot of people even doing this in writing. Obviously, there's some. I get it. But I think most people probably apply for these things online anyway, precisely for security reasons, because they're concerned about it realistically. Can you address in the limited time you have left the other two exemptions that the court didn't address? Yes, Your Honor. The duties of the position include custody of unsupervised cash or security or assets valued at $2,500 or more, or the position includes signatory power over business assets of $100 or more? Yes, Your Honor. So the first one has to do with the B-2 exception, the custody exception of $2,500 of cash or more. There is a stated concrete policy at Neiman Marcus that you can't have more than $1,000 in the POS system. You're just not allowed to. So you don't have access to cash in that amount. In that context, the POS system is the cash register? Yes, Your Honor. Correct. Now, again, anticipating what counsel might tell the court, you know, it is conceivable. Witnesses said it doesn't really happen, but somebody could come into Neiman Marcus and pay for something in cash in the amount of $2,600 or, I suppose, more. I'm not going to say it never, ever could happen, but, boy, first of all, it's unusual. We're under security, and that's not really having custody for the same reasons we talked about before. It's processing a transaction. It's more than that. I use the word conduit. It's a transfer. It's really odd that they would be concerned that somebody would plan to, you know, take money this way. Hopefully somebody comes in with that kind of money, and they're going to get away with it while being surveilled by three or four security guards. And, again, we fall back on all of the state of history. Senator Harmon says it really wasn't meant for the POS system operators, people that operate it. These people are under television cameras. And it's real time, and it's not just being taped. It's people literally watching. It's kind of like a casino, and this goes back to welcome to Neiman Marcus. I've never been in one, but I understand it is a very high-end merchandise place, so I get why they need security. Well, if their policy is that they don't have more than $1,000 in the cash register, I assume if I went in there and bought a $3,000, in this case, dress, that the sales clerk would call their manager and say, you know, the policy is I have more than $1,000 taken away. And you're assuming it's in the cash, of course. Right. Right. The B3 exception talks about signatory power. They're saying that the signatory power is when you sign into the POS system to have access to it to be able to operate it. Again, I don't think that's a fair definition of what signatory power means. I don't think that's consistent with the legislative history. That just gives you access to a system. You're not signing off as if you are approving a transaction or stating this is a ‑‑ I'm signing off on anything. Wasn't there a deposition of a Neiman Marcus employee that said we really don't have any business assets other than the merchandise we sell? That's also true. But, again, anticipating, you know, they do give, for example, gift cards, which could be more than $100. I get that. But it's not ‑‑ you're not signing off on it. You're simply ‑‑ it's a purchase. It's just like any other purchase. You're exchanging the gift card for the cash. Exactly. It's just like you're exchanging merchandise for cash or a credit card or whatever it is. And, again, they're overriding all these. We're having a hard time figuring out the jobs where this wouldn't apply to. Because even in the forklift example, you pointed out some exemptions or some areas where it may apply. They talk about the mechanic. Well, a mechanic probably has keys to a car that's worth more than $2,500. The forklift operator could be moving merchandise that is worth more than $2,500 or they could be delivering something that has secret information in there, confidential information. So it's just ‑‑ it's taken to an extreme here. And I think it runs contrary to the purpose, sorry, Your Honor, of the act. What about Ms. Olay's job opportunity? She was, you know, an experienced retail salesperson. She was given the job. Then they ran the credit check. Then the third-party vendor that ran the credit check told her, we're sorry, you can't get the job anymore. She was denied a job. And it seems to us she's exactly the kind of person that this act was designed to protect and help. So basically what I believe is so she can file a claim for damages as a result of a failure to hire. Correct, Your Honor. Is she? That's what this case is about. Okay. That's exactly what we're seeking. You hit it exactly nail on the head, Your Honor. Thank you. Thank you, Your Honor. Mr. Dishman. Thank you, Your Honors. May it please the Court. Although there are three exemptions in the act that are issued here in this appeal, there's a single common theme that runs through the parties' arguments on it. And that is that in each of these three instances, Ms. Olay wishes to add words to the statute that are not there, to ask this Court to rewrite the statute. I'll begin what the trial court did with the exemption for positions involving access to personal and confidential information. That's the 10b-5 exemption. Now, it's undisputed that sales associates, one of their duties is to receive and process customer applications for Neiman Marcus charge cards. It's also undisputed that there is at least some information in those applications that meets the act's definition of personal and confidential information. Ms. Olay does not claim otherwise. She agreed that at the very least Social Security numbers fit the bill. So really the only dispute over this exemption is over what it means to have access to this information. The statute does not define access, so we fall back on general English and legal dictionaries, which roughly define it as the ability to obtain or make use of something. And here, the associates have the ability to obtain or make use of, in other words, they have access to customers' personal information, such as their Social Security numbers. In fact, they have to have access to this information, because part of their job is to take that information and input it into the register before securing the application. They can send it to the credit office. I'm sorry? They can send it to the credit office. The testimony in the record is that the associate's duty is to, first of all, input the information from the application into the register and then send it to the credit office or secure it in the register until the end of the day and send it down to the credit office at that point. Anybody on the floor can take a credit application, correct? The record reflects that any sales associate on the floor can, yes. Management can't? Actually, I'm not sure if the record says that. Anybody who's a manager of a department, a sales representative, anybody that deals with the public, can go take it to the booth where I can pay my bill. I assume they would take the application. I mean, that's what I understood the record to say, that just about anybody who works there on the floor will take the application. Maybe not a security guard, but I can give it to a manager of a department, I would assume. So the record is clear that any sales associate can take an application. Everybody who's a sales associate. So that would basically say that in Neiman Marcus, everybody's credit can be checked. So this rule, if we agree with you, would exempt everyone in Neiman Marcus, is that correct? No, Your Honor. It would exempt every sales associate in Neiman Marcus, but not every employee. Who would not be exempted? Many Neiman Marcus stores have, for instance, a restaurant. The restaurant employees would not be exempt under this. You say that in your brief on page 8, sensitive information is Social Security numbers and credit card numbers. And you say this is clearly sensitive information. It says this is sensitive information. It includes credit card numbers. They have access to credit card numbers. So aren't they, then, under your definition here, included in personal and confidential information? So one point on which we in Missouli agree is that the Act clearly is not intended to cover folks who just swipe credit cards in front of customers at a register. The legislative history reflects that. But that's not what you're saying here. You said in the area of identity theft, Social Security numbers, credit card numbers, and the like are clearly sensitive information. Correct. So now you're saying there's a difference between sensitive information? So the difference here would be in terms of access. So, for example, the employee who does not take credit card applications but who simply swipes credit card transactions in front of the customer, I would not define that as having access to the information. The employee just takes the card and swipes it and hands it back. That's to be distinguished from our situation here where a sales associate takes the application with sensitive information in it, including Social Security number. Then, after the customer's gone, presumably, or perhaps in front of the customer, I suppose, inputs that information into the system. In other words, they have some role in processing the information. I thought they're supposed to put it right into the drawer. After they've inputted it into the system, yes. That's at Third Supplemental Record C-37 is one example of where there's undisputed testimony stating first they are to input the information into the system prior to securing it. But the policy of your client, correct, is that once that information is received by the clerk, let's call this applicant clerk. Correct. They don't entrust that information with the clerk, do they? They only give that information, they entrust the information only to management or to the loss prevention people. Correct? They don't entrust that information with the clerk. They entrust that information to the clerk until the clerk does her duty of putting it into the system and then transfers it to the cash office or to a manager. So are you equating the entrustment as equal between the clerk and the people in loss prevention who process the Social Security information to decide whether they're going to give the customer credit? No, Your Honor, but I don't believe that it has to be equal. And I'd also note that we're focusing here on the word access as opposed to entrustment. So the issue is... Not necessarily, because the statute says if the clerk, in this instance, has access to confidential information, the statute then defines confidential personal information as that information that the customer gives the employer, Neiman Marcus, and that Neiman Marcus only allows managers or select few employees, not low-level employees, to have. So, you know, it's one of these situations where the legislature has, you know, the public policy in mind of trying to ensure that people who suffered a bad credit rating because of the downturn in the economy aren't discriminated against in trying to get a job that has no relevancy to their credit rating. So, I mean, you can parse these words, but the practical effect of all this is what? That everybody who applies for a job in a retail store can be denied a job simply because they have a credit rating that doesn't meet the employer's needs? No, Your Honor. We are not advocating for a rule or a result that would sweep in every retail salesperson. It would only sweep in the retail salespersons that meet these particular definitions. You mean a retail salesperson that wouldn't meet this situation? I'd point to Ms. Owens' proverbial 7-11 clerk that she discusses in her briefs. I mean, there's no evidence in the record as to what 7-11 clerks do, but... We've all been in one. Correct, and I've never given my Social Security number to a 7-11 clerk. Have you given your credit card to a 7-11 clerk? I have. Okay. Does that contain sensitive information? It does, but I don't believe that that would qualify as access to the information. You handed it to him, the clerk. You handed him your credit card. You handed sensitive information to that clerk. Why is that different than handing my credit card to a Neiman Marcus sales clerk? Well, the difference, Your Honor, is that in our case, the Neiman Marcus clerk takes the application with... No, no, I'm saying the credit card. It's my credit card. I'm sorry, Your Honor. I guess I'm not following you. My credit card to a Neiman Marcus clerk, is that sensitive information I am handing the clerk? All right. Yes, it is sensitive information. So in that event alone, that should take that clerk out of the exemption or put him into the exemption of the statute? Only if they have access to it. Well, under your definition of access, they have access, don't they? The judge, in ruling your favor, used the most broad definition, right? Would you, you would agree that if I give you my credit card, that you have access to my credit card, right? Under your definition. It is arguable that that's the case. I'm not talking arguably. I mean, I'm talking about what your position is. Are you saying you're not clear on your position? Well, no, I think that the legislative history of the Act makes clear that the legislature did not intend for that to constitute access. Then that's the snippet that was referred to us. So the word access in and of itself does not end the story. It's only the beginning. Because what you're saying is, and you said it before, there's a difference in terms of access, correct? Correct. So now we need to determine what those differences are. In each particular case, there may be a difference. And we have to look at the specifics of the case. Correct. Using this broad definition would encompass what we just decided was not contemplated by the word access. Under the specific facts of this case, where, again, a sales associate does not just swipe the credit card, but takes the application, does something with the information, inputs it into the system, and then is responsible for securing it somewhere else. In our view, that clearly satisfies the meaning of the term access. Okay. But would you agree that doing that does not constitute entrusting that information with the clerk? In Neiman Marcus's policy, that that information is not entrusted with that clerk because that clerk has to deliver it up to loss prevention or somewhere else? Well, it's entrusted to the clerk for that period of time before the clerk transfers the information to somebody else. And never to have it again. Correct. So your definition of access would mean that any employee who is provided with a social security number of a customer or client is exempt under this act. Is that correct? Yes. So we have a hard and fast rule. If you obtain social security numbers, you're exempt. What else besides social security numbers? You said credit card numbers. It's sensitive, but not of that niche. How do we decide which is which? How do we decide if it's my weight or how much I earn? And to be frank here, we haven't focused, in our thinking on the case, we haven't focused on what else would classify as confidential information because social security numbers are at issue here and pretty clear. And it's been undisputed that they meet it. So other personal and confidential information. I should go back to the definition. Pardon me. So it's defined as sensitive information that the customer or client gives explicit authorization for the organization to obtain, process, and keep. Another example of this, I suppose, would be somebody who gives all the information necessary to prepare their tax return to an accountant, which also would include the social security number, but some other sensitive personal financial information. I believe that would also. So how much somebody earns? Is that access? If I sometimes want to know how much somebody earns, is that access to confidential information, sensitive information? No, I would say no, Your Honor. On what basis do you? Well, because there are many folks whose earnings are a matter of public record. For instance, certain public officials and public employees, their salaries are of public record. Good example, Your Honor. But what you're saying, then, is this is a case-by-case situation, then? We have to look at all the court has to have a factual hearing on determination of what this information is and who gets it and how long they hold it? Because in this case, it's summary judgment. Correct. And the reason we believe summary judgment was appropriate in this case is because, again, there's at least one piece of information here, the social security number, that everyone agrees meets the definition of personal and confidential information. And, again, we believe our facts here, where the employee takes the information, processes it, and then is responsible for taking it somewhere else to be secured, meets the definition of access. But there's a difference between defining something as personal and confidential and sensitive and then having access. It still doesn't tell us. Correct. As you said, there's differences in access. Right. So it's a two-step analysis. Yes. Of course, we need to look at that. But the second step is that we have to have a hearing to determine whether, in this situation, providing a social security number for an application is within the definition of access. No, Your Honor. We believe this is a matter of statutory construction. So the sort of dispute that would need to go to a jury in this case, if it existed, would be if there was actually some factual dispute over whether or not associates received this information at all or if there was some dispute over what information was actually contained on the application. The facts here are not disputed. Everyone agrees on. But the ink doesn't say what you say. I don't see the word any access. It says access. Correct. Well, it doesn't say all access, any access. So access, we have to have a reasonable definition of the word access. Do you agree with that? And whether or not that's extreme. And whether that extreme would include all or any. So I wouldn't characterize it as extreme, Your Honor, but I do believe that the statute, this exemption in the statute, the definition of access should be broad. And the reason for that is because there are other exemptions where the legislature specifically qualified to work. For example, one of the other exemptions at issue here, the one over $2,500 custody of cash is not at issue here, but one of the terms used in that section is unsupervised access to cash or merchandise. So the legislature qualified the word access when it chose to, and here it chose not to qualify. You would agree there's supervised access over $2,500, wouldn't you, Your Honor? Correct. So our only contention as to why the associates meet that exemption is that they have custody of cash of $2,500 or more. But it's supervised. It is, but the statute does not concern itself with that. The statute creates an exemption for custody or unsupervised access of $2,500 of cash. And we have only argued that custody is at issue here. Assets are not at issue here? No, cash only is what we're relying on, custody of cash. So exemption two or three, whatever it was, the access to assets of the company, that's not at issue here? Correct, Your Honor. Correct. Cash only. So is being a conduit in your definition access? Yes, Your Honor. In order to deliver sensitive information such as this, the employee has to have access to it. Again, there's more to the facts in this case. They also have a role of processing. No, they're just conduits, though. You don't have to have access. Because once they are conduits, they're given the information, and then they input it, and they can never get to it again, right? Correct. Or when they put in their drawer the application, can't get to it again. Correct. Well, no, I'm sorry. If they put it in their drawer, it's for them to safekeep it until the end of the day, and then they're still responsible for getting it. So at that day, they give it to the responsible parties? Correct. We agree that their access does end at some point. So can we agree that they are conduits? And the question then is whether a conduit would be included under the term access. Well, I don't agree that they are only conduits, Your Honor. As I said, they process the information, and then they're a conduit for it. What's the difference between what they do and taking a credit card and swiping it? The difference is that they have some responsibility for actually working with the information and that they then need to take the information and secure it in a separate place. That's the difference between simply that and swiping a credit card. I see I have just a minute left. May I sum up, Your Honors? Sure. Thank you. In drafting the Act, the legislature set a clear and careful balance between the interests of job applicants and the interests of employers. That balance is reflected in the plain language of the various exemptions that the Act contains. Ms. Orley's appeal is an attempt basically to narrow or to rewrite those exemptions to find some way to exclude herself from them. But she's addressing those arguments to the wrong body. Only the legislature can amend the language of the exemptions. This Court's role, of course, is to apply it as written. Three of those exemptions, as they are written, apply here. Any one of the three is sufficient to affirm summary judgment. The facts that support those exemptions are undisputed. That's why the trial court granted summary judgment, and that's why we're asking this Court to affirm. All right. Just let me clarify. I thought you said the $100 control over $100 of assets of the company are not at issue here. Oh, so. So two of the three. So I think we're conflating two exemptions there. So there's the personal and confidential information is one. There's the custody of cash of $2,500 or more. That's in Section 10b-2. Marketable assets. That's correct. That exemption does speak of marketable assets, but we're relying only on the cash portion of it. All right. So you're not relying on 10b-3. The duties of the position include signatory power over business assets of $100 or more per transaction. We are relying on that one, Your Honor. I just did not have time to discuss it. You are relying on it. Yes. Well, that's what I was asking about is what control over business assets is this? Well, does this clear it in half? I apologize, Your Honor. I misunderstood. I thought you were talking about marketable assets under 10b-2. So the business assets at issue when it comes to the 10b-3 exemption can take a couple of different forms. This particularly comes up in the context of returns. So sales associates have the power to sign away, in some cases, thousands of dollars of Neiman Marcus gift cards, Neiman Marcus store credit, and they have the ability to sign away cash refunds of up to $100, which is the floor that this exemption sets. But they're not signing away anything. They're taking merchandise back and crediting the account, theoretically, right? They're taking $100 in cash or off a credit card and issuing a $100 gift card. So they're not disposing of an asset, are they? They're exchanging. Well, yes, in order to make the exchange, they're disposing of an asset. In other words, the – It's a loss. There's no – they're getting something back that's of equal value. Correct. But the exemption doesn't say that it has to be a net transaction of $100. For instance, they don't have to have the ability to give away $100 with nothing in return. But, you know, listen, I don't think anybody's interested. The legislature, the courts, you or the plaintiff is interested in handcuffing Congress. Well, let's just take it to this extreme then. So any return over $100 in any business in Illinois would exempt that employee. If that employee has signatory power to do it. No, they have no signatory power. This is not signatory power. If they can take a return over $100 – I mean, everything's on their computers today. You're saying that that's an exemption. So if I go to the gas station and I have some work done and they made a mistake in the bill that gives me $100 – $150, apparently that could happen. So under that scenario, they'd be exempted. The employee who can authorize the transaction is exempt, yes. So, for instance, an employee who processes the front desk at returns but has to get a manager's approval for transactions of a certain size would not be swept in by this exemption. And so at Neiman Marcus, what's the policy?  In some cases, returns of thousands of dollars give away, store credit in return for them, give gift cards in return for them, unless the associate senses something about the transaction that seemed – or something about the return that seemed suspicious to them, in which case it's on them to go involve a manager. But unless there's some red flag, it's the associate's discretion. So where in Illinois is anybody who accepts over $100 of returns and has authority to do so exempt the employee? So that's what's at the intent of the legislature. I mean, we're going to have more exemptions than we're going to have people included on this. All I can say, Your Honor, is that – Is that the intent? – is that the legislature reflected its intent in the – Well, there is a special rule of signatory powers, so – Well, let me just try to wrap this up. In the example that Justice Simon just gave about returning $100 or exchanging or whatever, what does the clerk's credit history have to do with whether that clerk should be doing that job? What's the relevancy of the credit history of that employee in that transaction? So I want to be careful in going down this road, because I'll answer your question, Your Honor, that one can presume that the legislature's intent in creating these exemptions and in the way that it drafted the exemptions was to exempt positions where employees have an opportunity for things like identity theft or regular theft or what have you. One can assume that's what the legislature was getting at here, but I want to stress that the exemptions do not actually require us to show that an employee had an opportunity to steal, right, or was at particular risk for – to commit identity theft or what have you. The legislature drew up the exemptions – The question is what's the relevancy of the clerk's credit history in the transactions that you were discussing with Justice Simon? What's the relevancy of whether that person has a favorable – I'll redefine that – or unfavorable – I'll redefine that – credit history? I presume the legislature's concern there was that somebody who is in a poor financial situation, you know, might be more motivated to commit misconduct in a situation like that, and so that – so employees that have signatory power over a certain floor of a company's assets, that's something that the company should be able to concern itself with their credit history. Again, I'm trying to – I'm sorry. Later they realized they couldn't get any employees, and so they stopped the practice. Correct. They did make a business decision to stop the practice later. I would stress, though, that the legislature does not – or the Act, rather, does not concern itself here with the company's state of mind or its intent or whatever its subjective business reasons were behind having the practice or later discontinuing it, but rather just with the objective facts of whether or not the position meets the exemption. Well, since it went towards the financial wherewithal of the purportedly possible employment, then what else was there other than money as the basis for it? You know, the ability of someone to either have some resources, which meant they really didn't need your job. It's sort of a dichotomy. Then you have to have money to get a job. Is that the premise of this? That's what they were asking? No, I don't believe the Act – Maybe not as crass as that. Right, right. So the Act, as I said, strikes a balance between the interest of applicants and the interest of employers. And the best indication we have of how the legislature wanted to strike that balance was in the words that it used in the exemptions, and that's why we and the trial court have focused on the literal words in the exemptions. Thank you, Mr. Dishman. Thank you, Your Honors. Mr. Sears. Briefly, please. Very briefly. To follow up on Your Honor, Justice Simon's statement that Neiman Marcus did change their practice, had Cathy applied just two weeks later, she would have gotten a job. She wouldn't have been denied it. So at that time, Neiman Marcus made a decision that this wasn't relevant to her job, whereas before they somehow said it was. They've made a decision for the last three years that it's not relevant, it's not a bona fide occupational requirement, and to the extent there are these risks, they've been taking them affirmatively for all these three years. They're allowed to do that. They're allowed to do that, Your Honor. So it's not relevant to our decision. It's certainly not an admission or anything like that. We're not getting to that, Your Honor. Only that what we're saying is that that suggests it was never relevant in the first place. No, but relevancy isn't the question, so they have to follow it. If they want to, they can. Absolutely correct, Your Honor. They have the absolute business right to do that. We just pointed it out because it may shed some light on the issue. There is, I should point out, a dispute, we believe, in the record as to whether or not they input this data into the POS system after they get the application. Their loss prevention had testified that the physical credit card application is then either stored in a POS register or taken down to security. That's the third supplemental record, C92-93. So it's not clear if there's necessarily inputting. Maybe it is in some cases, maybe not in others. To the extent that's relevant, we thought we should point that out. Unless there's other questions in sum, we believe that we have a situation here where the exemptions are swallowing the rule, are defeating the purpose. We would respectfully request an order reversing the order granting summary judgment to the defendant and remand for further proceedings. Thank you. Thank you, Your Honor. This matter will be taken under advisement. We appreciate your well-briefed and well-argued positions. Thank you. Court is in recess.